IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 23, 2024 Session

**STATE OF TENNESSEE v. RALPH LEE ATKINS, JR.**

**Appeal from the Criminal Court for Knox County**
**No. 118075      G. Scott Green, Judge**

_____

**No. E2023-00368-CCA-R3-CD**

_____

The Defendant, Ralph Lee Atkins, Jr., was convicted by a Knox County Criminal Court jury of second degree murder, a Class A felony. *See* T.C.A. § 39-13-210 (2018). The Defendant was sentenced to twenty-two years' incarceration. On appeal, he contends that the evidence is insufficient to support his conviction. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which TOM GREENHOLTZ and KYLE A. HIXSON, JJ., joined.

Joshua Hedrick, Knoxville, Tennessee, for the appellant, Ralph Lee Atkins, Jr.

Jonathan Skrmetti, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Charme P. Allen, District Attorney General; and Nate Ogle and Sean Bright, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

This case arises from the May 15, 2020 stabbing death of Eric Yorker at a Safe Spaces facility[1] for homeless persons. The Defendant did not deny stabbing and killing the victim. Rather, he asserted that he acted in self-defense during an altercation with the victim.

At the trial, the recordings of two 9-1-1 calls were received as an exhibit and played for the jury. In the first recording, a woman, identified as Wanda, reported that the forty-

_____

[1] This area is referred to Safe Space, Safe Spaces, Safe Place, and Safe Spot throughout the record. We use Safe Spaces for consistency.

eight-year-old victim had been stabbed in the chest outside the mission, which was near Safe Spaces, and that the man had uncontrolled bleeding. In the second recording, the victim requested medical assistance and reported having heavy bleeding. The victim repeatedly mentioned a "car," and an unidentified person in the background told the victim to lie on the sidewalk.

Gordon Miller testified that he, the victim, and the Defendant, who was known as "Pop," were homeless at the time of the victim's death but that they stayed at the mission. Mr. Miller said he arrived at the mission around 3:00 p.m. on the day of the stabbing. Photographs of the area were received as exhibits and reflect a gated area under a bridge and tables inside the gated area. Mr. Miller said that the victim and the Defendant were inside the gated area, that the Defendant spoke to the victim, and that the victim sat at a table with his back to the table while facing toward the Defendant. Mr. Miller said that the Defendant brandished a "big hunting knife" and that the victim sat in such a way to ensure his back was not toward the Defendant. Mr. Miller said that the Defendant waved the knife and was "mad at somebody obviously." Mr. Miller said that the Defendant spoke in a "kind of threatening" manner but that the victim was not "really saying anything." Mr. Miller said he "heard" the dispute was "about a woman or something like that."

Mr. Miller testified that he attempted to intervene by asking the Defendant to put away the knife before the Defendant hurt himself or caused "trouble" for himself. Mr. Miller said that initially, the Defendant did not listen to him but that Mr. Miller asked the Defendant about a crucifix the Defendant possessed in an effort to redirect the Defendant. Mr. Miller said the Defendant put away the knife "for a second." Mr. Miller recalled that the victim stood "out of the blue," that the Defendant retrieved the knife and brandished it again, and that the Defendant spoke angrily and indiscernibly to the victim. Mr. Miller said that the victim did not appear to understand the Defendant, that the victim did not respond to the Defendant, and that the victim did not threaten the Defendant. Mr. Miller said the victim did not possess a weapon when he stood. Mr. Miller said that events transpired quickly after the Defendant brandished the knife for the second time but that the Defendant approached the victim, that the victim stood, and that "the knife went in" the victim's chest. Mr. Miller said that initially, twenty to twenty-five feet separated the Defendant and the victim and that just before the stabbing, the Defendant and the victim "were almost face-to-face." Mr. Miller recalled that the victim stood when the Defendant was about six feet from the victim. Mr. Miller said that the victim did not strike or push the Defendant. Mr. Miller stated that after the stabbing, the Defendant looked at him "funny" and "took off and went around the corner." Mr. Miller said the victim attempted to call 9-1-1 as he walked toward the exit of the gated area but that the victim collapsed onto the sidewalk.

On cross-examination, Mr. Miller testified that he had been homeless periodically for fifteen years and that at the time of the incident, he had been homeless for six years. He described some of his daily struggles associated with homelessness and stated that it

was difficult to stay safe. He said that the difficulties of homelessness were compounded by age, that younger homeless persons "don't care" and did not respect older homeless persons, and that younger homeless persons stole from the older persons.

Mr. Miller testified that he did not know what the Defendant and the victim discussed or what transpired before he arrived. Mr. Miller described the victim as approximately five feet, nine inches tall, between the age of late thirties to early forties, and "pretty fit." Mr. Miller considered the victim to have been a friend and said he would have trusted the victim with his belongings.

Brent Ogle, a security officer for Safe Spaces where the incident occurred, testified that at the time of the stabbing, he heard screams and responded to the victim's location. Mr. Ogle said the victim had been stabbed in the chest and bled profusely. Mr. Ogle said that he began asking those around the victim who was responsible and that he saw a person, later identified as the Defendant, holding a knife and running from the area. Mr. Ogle said that he chased the Defendant, who stopped voluntarily and who had a hunting knife in his hand. Mr. Ogle said that he told the Defendant to hold onto the knife until the police arrived and that he asked the Defendant why he stabbed the victim. Mr. Ogle said the Defendant stated that "it was an argument, a confrontation, argument, disagreement type situation." Mr. Ogle noted that the Defendant was upset, angry, and shaken.

On cross-examination, Mr. Ogle agreed that he previously testified at the preliminary hearing that the Defendant did not run from the scene but, rather, "briskly" walked up the street. Mr. Ogle stated that his previous testimony was true but clarified that the Defendant was "getting away from the scene."

Knoxville Police Department (KPD) Investigator Preston Willock testified that he responded to the scene and apprehended the Defendant. Investigator Willock stated that he retrieved the knife, which had been sheathed, from the Defendant's waist and that the Defendant asked him not to take the knife. Investigator Willock said that the Defendant responded with "rambling utterances about I did it, I was tired of . . . him f------ with me, I was tired of it."

On cross-examination, Investigator Willock did not recall if the Defendant's hands were bloody but testified that he would have noticed if the Defendant's hands were "covered in blood."

KPD Crime Scene Investigator Bethany Simmons took photographs, which were received as exhibits, during her investigation. The photographs reflect, in relevant part, blood on the sidewalk and the victim's and the Defendant's belongings at the crime scene. Photographs of the victim showed blood on his leg. Photographs of the Defendant showed blood on his hands, shirt, and shorts. Ms. Simmons did not note any injuries to the Defendant. Ms. Simmons stated that the knife used during the stabbing and a wallet

belonging to another person were taken from the Defendant. Ms. Simmons stated that she did not find a weapon in the victim's belongings.

KPD Investigator Clayton Madison testified that he responded to the scene and attempted to find witnesses to the stabbing. He said that Michael Stacey provided a statement at the scene but that Mr. Stacey had since died. Investigator Madison interviewed the Defendant about one and one-half hours after the stabbing. A portion of the video-recorded interview was received as an exhibit and played for the jury.

In the recording, Ms. Simmons took photographs of the Defendant, and the investigator offered the Defendant a drink. The then-sixty-seven-year-old Defendant stated that he wanted a drink and that he was "beat half to f------ death and nobody cares if I fight back, nobody cares. They'll put me in jail." The Defendant said, "I fought back, and I'm going to jail. There is something not right about that." The Defendant was provided a drink, and he complained about the lack of police presence where homeless persons congregated. He said homeless persons were "treated like s---," even by each other, and that "I just stand up to them . . . . Ain't nobody want to f--- with me cause they know one thing. I'm gonna kill their . . . a--. They ought to leave me alone. Too old for this bulls---. I don't need no help."

The Defendant stated that he went to the gated area regularly but that "no good[]" people who were there "dictate[d]" to others. The Defendant said that he did not adhere to "their rules," that he was not going to sell drugs, and that he did not want to "f--- with them." The Defendant said that "they think" they can "f---" him over because he is "white and old." He said that the victim "started running his mouth" and told him to "get out of [the victim's] face." The Defendant said that the victim pushed him twice and that he "stabbed the motherf-----." The Defendant said the victim was "trying to be Mr. Macho," "jumped" in the Defendant's face, and pushed the Defendant backward with both hands. The Defendant said the argument spanned approximately ten minutes, during which time the victim was "talking crazy and s---."

The Defendant stated that initially, the victim argued from a seated position at a table but that the victim stood, which "was when the s--- come on." The Defendant continued that he did not "say a d--- word" and that he did not do anything to the victim before the victim stood. The Defendant agreed, though, that he and the victim argued before the victim stood. The Defendant said that they argued because the victim cursed him and told him "what to do." The Defendant recalled that he told the victim that although the Defendant might be old, the Defendant was "nobody's b----." The Defendant said that he did not "f--- with these people" and that nobody was going to bother him. He said the that victim attempted to "get in [the Defendant's] face," stood, and "pushed [the Defendant] away."

-4-

The Defendant recalled that a man standing nearby asked the Defendant about his necklace, that the man wanted it, and that the Defendant declined to give it to the man. When asked if the man stood nearby at the time of the stabbing, the Defendant said that he did not know who was nearby. He said that during the incident, he thought about all the people in the area and about the people simultaneously surrounding him. He said that he went "into defense mode" and attempted to protect himself. When the investigator asked for the Defendant's version of events, the Defendant implored the investigator to spend time in the area where the stabbing occurred. The Defendant referred to a previous incident in which he was struck on the head with channel locks and said the responding officer knew the environment at the mission and the gated area under the bridge. The investigator asked about the "dynamic" between the Defendant and the victim, and the Defendant said that he and the victim had never met before the day of the stabbing and that he first saw the victim a couple of hours before the stabbing.

The Defendant said that sometimes people wanted "to showboat" and "run their mouths" and that the victim "run his mouth to me" for about thirty minutes without the Defendant's responding. He said that the victim wanted to be part of the culture involving prostitution and drugs and that the victim was attempting to build a reputation by approaching the Defendant.

The Defendant stated that he had been staying at a city park where the police did not "bother" him because the police liked him. He said he did not bother anyone. He said that he returned to the gated area under the bridge after not having been there for some time in order to recoup a debt from another person. He said that he recouped the debt and that the victim did not like the Defendant's being there around "Hank," who the Defendant considered a friend and "checked" on periodically. The Defendant said that Hank and the victim were "hanging," that the victim thought the Defendant was going to attempt to "get something" from Hank, and that the victim told the Defendant "more or less to get the f--- out of dodge." The Defendant said that nobody was going to tell him where he could and could not go. He stated that the victim "jumped in my face" and said, "You ain't gonna do nothing." The Defendant said he told the victim that he was old, did not feel liking fighting, and to "leave [him] alone." The Defendant said the victim "moved his hands, and that was it." The Defendant said his hand was injured. He said that the victim told him to leave and to get out of the victim's face, that the victim pushed him, and that he told the victim that Hank was his friend, as well.

The Defendant said that he did not kill the victim, that he stabbed the victim in the muscle, and that he knew "where the death places . . . are." The Defendant denied attempting to kill the victim, whom he referred to as a "punk," and said he was not going to "take his s---" anymore. The Defendant said that he carried his knife on his belt in order for everyone to see it and that he removed it from the sheath when the victim "popped up" on him. He said that he held the knife with the blade pointed downward and that he had to raise his arm to "do it." He said that about three feet separated him and the victim when

he removed the knife from the sheath, that the victim told the Defendant to get out of the victim's face, and that the victim said, "You ain't gonna do nothing, punk." The Defendant said that the victim moved as though he were going to "make a move around Hank toward [him]" and that he "tagged" the victim once with the knife when the victim moved. The Defendant said that he could have easily killed the victim but had not. The Defendant said that the victim walked away and that the victim realized he was not going to bother the Defendant anymore. When asked if the victim struck him, the Defendant said the victim did not have the opportunity to strike him.

The Defendant stated that he did not feel as though he could walk away from the victim and that he thought the victim would have "grabbed" him. The Defendant said that he did not want to kill the victim and that he would have needed to stab the victim in the carotid artery to kill the victim. The Defendant admitted drinking rum earlier in the day and estimated his intoxication level was five or six out of ten.

The Defendant stated that he had previous "troubles with fighting and scraping" in the area where the stabbing occurred and that the police did not do anything about it. He said that he had been hit on the head and "jumped on" many times and that his belongings had been stolen. He said that he "finally said, . . . enough is enough." He said that he was "tired of it" and that he only tried to protect himself. The Defendant said that Mr. Ogle, who told the Defendant to give the officer the knife, said he would tell the police "how they mess with [the Defendant] all the time." The Defendant said that he did as Mr. Ogle instructed and that he sat on the sidewalk curb waiting for the police.

The Defendant stated that he did not fall during the incident and that the victim was standing at the time of the stabbing. The Defendant explained that after the victim stood, the victim pushed him and "started like he's gonna . . . hit me or something." The Defendant stated that he responded, "No, you ain't," and that he stabbed the victim. The Defendant said that he hated the situation "had to come to that consequence" and that he did not want to hurt anyone. He said that he could not walk away because if he had walked away, he would have had to "deal with three or four more motherf------ that think you're a b----." He said that he stabbed the victim because he was finished being assaulted and because "they've assaulted me enough."

On cross-examination, Investigator Madison testified that the Defendant was cooperative. After reviewing the recording of the interview, Investigator Madison agreed that the Defendant signed the waiver of rights form with his right hand. Investigator Madison agreed that the victim was much younger and weighed more than the Defendant. Investigator Madison agreed that the Defendant had been assaulted and had been the victim of theft and that the Defendant explained he was not going to be "hit, jumped, stole from, [and] beat on" again.

On redirect examination, Investigator Madison testified that the Defendant did not identify the victim as having played a role in the previous assaults against and thefts from the Defendant. Investigator Madison stated that the Defendant did not accuse the victim of striking the Defendant before the stabbing but conceded that the Defendant said the victim pushed the Defendant. Investigator Madison said that the only person with a weapon was the Defendant.

Other evidence showed that the cause of death was a single knife wound to the victim's left lung and heart and that the manner of death was homicide.

The Defendant testified that he obtained his GED after leaving school in the tenth grade. He served time in the Marine Corps and had not always been homeless. He said that he lived with his wife of nearly thirty years until her death in April 2017 and that afterward, he had a nervous breakdown and lost his home. He stayed with family members, but in 2019, he ultimately became homeless at age sixty-six. He said his belongings included a couple sets of clothes, photographs of his wife, and a few mementos. The Defendant said that he suffered from a deteriorating back disk and scoliosis, that he did not have full use of his left arm, that he was handicapped and disabled, and that he suffered from chronic insomnia, excessive anxiety disorder, and post-traumatic stress disorder. The Defendant identified his treating physicians.

The Defendant testified that homeless persons came to the gated area under the bridge because they had nowhere else to go. He said that housing and employment were difficult to find. He said he did not look like the man he was before he became homeless. He said that his age and physical ailments made him a "target" on the streets but that he did not have "much of a choice" to go to the gated area under the bridge and to the mission because it was an area where homeless persons could obtain food and clothes. He said he was robbed several times. He recalled an incident in which he was approached by two men, who asked for cigarettes. The Defendant said that as he reached for his cigarettes, he was struck on the head and that the men took his phone and wallet. He said that he had, likewise, been assaulted and noted that security officers did not "break up" fights, drug use, and alcohol use in the area. The Defendant said the security officers were "not involved in anybody's security." The Defendant recalled another incident in which he was assaulted and his wallet was taken when he was brushing his teeth and shaving at the mission. He said that the man headbutted him, that he did not understand why the man attacked him, and that he would have been severely injured if two people had not intervened. The Defendant said that he endured incidents such as these all of the time. He said his knife was an all-purpose tool and worked as a deterrence to others.

The Defendant testified that on the morning of the incident, he went to the mission at 5:30 a.m. to eat breakfast and that he left and visited a friend, who shared a drink with the Defendant. The Defendant said that afterward, he and another man drank rum. The Defendant said that he returned to the mission and walked to the gated area under the

bridge. He said that the victim sat at a table with two men whom he identified as "Will," who was in a wheelchair, and Mr. Stacey, who had since died. The Defendant said Will and the victim were smoking "a bowl" and methamphetamine. The Defendant said he carried his backpack on his shoulder and his knife sheathed on his belt. The Defendant said that when he saw the men, the victim said to the Defendant, "What are you looking at?" The Defendant recalled that ten feet separated him and the victim when the victim spoke, that the Defendant continued walking, and that the victim repeated his question "real smart like." The Defendant said that the victim "kind of scared" him because the victim rose from the table quickly and stated, "[P]unk, you ain't going to stab nobody, I stick that knife up your a--." The Defendant said he had removed the knife from the sheath because he was scared and because he could not fight anymore.

The Defendant testified that he "backed off" but that the victim "come up anyway toward" him and pushed him backward twice. The Defendant stated

> I just struck out, I mean just one time, I wasn't trying . . . to hurt him. If I wanted to kill him or something I would have stabbed him a lot more than one time. That's absurd. I mean, stabbed him one time and die, it's almost unheard of. I wasn't trying to kill that man. I just wanted him to get off of me. I am tired of getting beat on.

The Defendant stated that after the stabbing, he walked across the street. He denied that he ran from the scene or hid from the police and said that he did not think he did anything wrong. He said he did not realize he had hurt the victim because the victim "backed away" and was not bleeding. The Defendant said the victim began to bleed after walking to the sidewalk because there was not any blood inside the gated area.

The Defendant testified that he sat on the corner of the sidewalk for a moment to collect his thoughts and that Mr. Ogle "jumped on" him and told him to return to the scene. The Defendant said that he declined to "approach that police officer with a knife in [his] hand, no telling what [the officer] might think." The Defendant said that Mr. Ogle told him to return to the scene with the knife and that Mr. Ogle said he would tell the police "that they jumped on [the Defendant] all the time." The Defendant said that he and Mr. Ogle walked toward a police officer and that he handed the knife to the officer.

The Defendant testified that he was mad and upset at the police station because the police took all of his belonging, including his clothes, and that he did not know the victim had died. The Defendant said that he did not want to hurt anyone, that he did not intend to kill the victim, and that he only wanted the victim "to get off [him] and leave [him] alone. The Defendant said that he was tired of being "beat upon" and "picked on all the time." He said he could not use his left arm, could not fight, and had limited movements because he carried a backpack. He said that he "struck out the one time and that's when [the victim] started coming to me and pushed me, I just wanted [the victim] to get away, wanted [the

victim] to back off and leave me alone and [the victim] did. [The victim] did and . . . walked away." The Defendant said that he did not know the victim had been hurt "that bad, not to die." He said that during his police interview, he was angry, upset, and tired and that he was venting his frustrations. He said he did not "mean it that way" when he said he was going to kill anyone who messed with him.

The Defendant testified that the gated area under the bridge would be safer with a consistent police presence. He said that he became scared when the victim threated to stick the knife up his "a--." He said that ten days before the stabbing, he was struck on the head with pliers requiring medical staples. He said that he felt he could not turn his back toward the victim, that he carried his backpack, and that "all [the victim] had to do was hit [the] backpack and [the Defendant] would have been on the ground." The Defendant said that when the victim came toward him, he only wanted the victim to leave him alone. The Defendant said that he stabbed the victim once, that the victim "backed off," and that the victim walked away. The Defendant said the victim did not talk or bleed profusely.

The Defendant testified that he did not feel as though he could have turned and walked away because he feared being "choked, jerked around" and because he feared the victim would have "grabbed" him. The Defendant said he would have walked past the victim if the victim had continued talking to the victim's friends and left him alone. The Defendant said that he did not have any reason to interact with the victim until the victim "come up from the table," which scared him.

On cross-examination, the Defendant testified that around 9:00 a.m. on the day of the stabbing, he went to the gated area. He said that he carried his knife at this time but that he did not brandish it. He said that he showed the knife to a man known as "Frank," that he bought the knife from Frank two weeks before the stabbing, and that he wanted Frank to know he still had the knife because he promised he would not trade or sell it.

The Defendant testified that that when the victim stood from the table, he was about four feet from the victim. The Defendant said that the verbal argument lasted no more than ten minutes and that Mr. Miller was not present during the verbal argument. The Defendant did not recall waving his knife around, screaming at the victim, or Mr. Miller's asking about the Defendant's necklace. The Defendant said that Mr. Miller might have asked about the necklace but that Mr. Miller did not "stay there." The Defendant said that during the "heat of conflict," he did not remember "everything going on around" him and everyone who was present. He said that although Mr. Miller might have been present and asked about the necklace, Mr. Miller was not present for the stabbing.

The Defendant testified that he thought the victim "had something" in his hands when the victim stood. The Defendant said that the incident occurred quickly, that the victim stood, that the victim moved toward him, that the victim pushed him, and that the victim "backed up." The Defendant said that he began to "walk off" but that the victim

stood again. The Defendant said that he retrieved the knife after the victim pushed him, that he backed up against a table, and that about four feet separated them. The Defendant agreed that he did not walk toward the exit of the gated area.

The Defendant testified that the victim's wound did not "gush[] blood" at the time of the stabbing and that he saw no blood inside the gated area. The Defendant said that after the stabbing, the victim talked to Mr. Stacey and walked away and that the Defendant walked away, too. The Defendant said that he did not have blood on him and that the knife was not covered in blood. The Defendant said that when he stated in his police interview that the victim did not have the opportunity to strike him, he was referring to the victim's striking him with a fist. The Defendant said that the victim "runs like a lunge . . . coming at him" after the victim stood. The Defendant did not know whether the victim had a weapon but said the victim did not display a weapon at the time of the stabbing.

On redirect examination, the Defendant testified that at the time of his police interview, he was tired, thirsty, hungry, upset, and intoxicated. He said that just before the stabbing, he was walking toward the exit and that the victim was between him and the exit when the victim stood from the table.

Upon this evidence, the jury found the Defendant guilty of second degree murder. The trial court imposed a twenty-two-year sentence. This appeal followed.

## I.      Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his second degree murder conviction. He argues that the evidence supports his claim of self-defense and, alternatively, that the evidence is sufficient to support voluntary manslaughter. The State responds that the evidence is sufficient and that the evidence adequately rebutted the Defendant's claim of self-defense.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). A conviction may be based upon circumstantial evidence alone. *See Dorantes*, 331 S.W.3d at 380-381.

Second degree murder is a knowing killing of another. T.C.A. § 39-13-210(a)(1); *see id.* § 39-11-106(a)(20) (2018). With regard to second degree murder, a person acts knowingly "when the person is aware that the conduct is reasonably certain to cause the result." *Id.* § 39-11-302(b) (2018); *see State v. Page*, 81 S.W.3d 781 at 787. "[T]he 'nature of the conduct' that causes death is inconsequential." *Page* 81 S.W.3d at 787. A knowing intent is shown if the defendant acts with an awareness that his conduct is reasonably certain to cause the victim's death. *See id.* at 790-93.

In Tennessee a person acts in self-defense when he or she

> is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if: (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury; (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and (C) The belief of danger is founded upon reasonable grounds.

T.C.A. § 39-11-611(b)(2)(A)-(C) (2018) (subsequently amended). Once a defendant has raised sufficient facts to support a finding he acted in defense of self or another, "The [S]tate has the burden of proof to negate the defense; the burden is not upon the defendant to prove the defense exists." *State v. Belser*, 945 S.W.2d 776, 782 (Tenn. Crim. App. 1996) (citing T.C.A. § 39-11-201(a)(3)).

In the light most favorable to the State, the evidence reflects that the Defendant and the victim argued while inside the gated area under the bridge. Mr. Miller testified that the Defendant stood near the table at which the victim was seated. The Defendant was "mad at somebody obviously" and brandished a large knife while arguing with the victim. Mr. Miller recalled that the victim sat with his back toward the table, not the Defendant. The Defendant spoke in a threatening manner, although the victim did not "really say anything" to the Defendant. Mr. Miller intervened and attempted to redirect the Defendant by inquiring about the Defendant's necklace. Although the Defendant returned the knife to the sheath "for a second," the Defendant retrieved the knife from the sheath when the victim stood from the table, at which he had been seated, as the Defendant approached the victim. The Defendant was angry and spoke indiscernibly to the unarmed victim. The victim did

-11-

not appear to understand the Defendant and did not threaten or strike the Defendant. As the victim and the Defendant stood "almost face-to-face," the Defendant stabbed the victim in the chest, perforating the victim's heart and left lung. As a result, the jury could have concluded beyond a reasonable doubt that the Defendant's stabbing the victim in the chest was reasonably certain to cause the victim's death.

In reaching this conclusion, we have not overlooked the Defendant's claim of self-defense. The Defendant testified that he felt threatened by the victim and that he stabbed the victim because he was unable to defend himself against others due to his age and physical impairments. The Defendant testified that the victim was the first aggressor and that the Defendant removed the knife from the sheath because he was scared and because the victim rose quickly from the table. Although the Defendant's testimony conflicted with Mr. Miller's testimony regarding the incident, the trial court instructed the jury on self-defense because the defense was fairly raised by the proof. We note that the court also instructed the jury on voluntary manslaughter. The jury heard the testimony, and the verdict reflects that it credited the testimony of Mr. Miller over that of the Defendant and discredited the Defendant's claim of self-defense. Questions regarding witness credibility and the weight of the evidence were resolved by the jury. *See Bland*, 958 S.W.2d at 659; *see also Sheffield*, 676 S.W.2d at 547. The evidence is sufficient to support the Defendant's second degree murder conviction. He is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE